

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*
*Northern Division*

---

*Rod J. Rosenstein*
*United States Attorney*

*Gregory R. Bockin*
*Assistant United States Attorney*

*36 South Charles Street*
*Fourth Floor*
*Baltimore, Maryland 21201*

*DIRECT: 410-209-4900*
*MAIN: 410-209-4800*
*FAX: 410-962-5130*
*TTY/TDD: 410-962-4462*

August 9, 2013

OCT 0 8 2013

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
                    DEPUTY

Larry A. Nathans, Esq
Nathans & Biddle, LLP
120 East Baltimore Street
Suite 1800
Baltimore, Maryland 21202

## Re: United States v. George Warhola

Dear Mr. Nathans:      WDQ-13-0526

This letter, together with the Sealed Supplement, confirms the plea agreement which has been offered to the Defendant by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have him execute it in the spaces provided below. If this offer has not been accepted by August 23, 2013, it will be deemed withdrawn. The terms of the agreement are as follows:

### Offense of Conviction

1.      The Defendant agrees to waive indictment and plead guilty to a criminal information charging him with one count of corruptly obstructing, influencing, or impeding the due administration of justice, in violation of 18 U.S.C. §1503. The Defendant admits that he is, in fact, guilty of that offense and will so advise the Court.

### Elements of the Offense

2.      The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows:

<u>18 U.S.C. §1503 - Endeavoring to Influence, Obstruct or Impede the Due Administration of Justice:</u>

   a.    That there was a pending judicial proceeding;

Revised 4/14/2011

b.  That **GEORGE WARHOLA** had knowledge or notice of the pending proceeding; and

c.  That **GEORGE WARHOLA** acted corruptly, that is, with intent to obstruct or impede the proceeding in its due administration of justice.

## Penalties

3.  The maximum sentence provided by statute for the offense to which the Defendant is pleading guilty is as follows: 10 years of incarceration, 3 years of supervised release, a $250,000 fine or twice the amount of gross gain or loss derived from or caused by the offense, and forfeiture of all property involved in the offense. In addition, the Defendant must pay $100 as a special assessment pursuant to 18 U.S.C. § 3013, which will be due and should be paid at or before the time of sentencing. This Court may order the Defendant to make restitution pursuant to 18 U.S.C. § 3664.[1] If a fine or restitution is imposed, it shall be payable immediately, unless, pursuant to 18 U.S.C. § 3572(d), the Court orders otherwise. The Defendant understands that if he serves a term of imprisonment, is released on supervised release, and then violates the conditions of his supervised release, his supervised release could be revoked - even on the last day of the term - and the Defendant could be returned to custody to serve another period of incarceration and a new term of supervised release. The Defendant understands that the Bureau of Prisons has sole discretion in designating the institution at which the Defendant will serve any term of imprisonment imposed.

## Waiver of Rights

4.  The Defendant understands that by entering into this agreement, he surrenders certain rights as outlined below:

a.  The Defendant has the right to have his case presented to a Grand Jury, which would decide whether there is probable cause to return an Indictment against him. By agreeing to proceed by way of Information, he is giving up that right, and understands that the charges will be filed by the United States Attorney without the Grand Jury.

b.  If the Defendant had pled not guilty, he would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

c.  If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the

---

[1]  Pursuant to 18 U.S.C. § 3612, if the Court imposes a fine in excess of $2,500 that remains unpaid 15 days after it is imposed, the Defendant shall be charged interest on that fine, unless the Court modifies the interest payment in accordance with 18 U.S.C. § 3612(f)(3).

2

opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

      d. If the Defendant went to trial, the government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in his defense, however, he would have the subpoena power of the Court to compel the witnesses to attend.

      e. The Defendant would have the right to testify in his own defense if he so chose, and he would have the right to refuse to testify. If he chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from his decision not to testify.

      f. If the Defendant were found guilty after a trial, he would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges against him. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

      g. By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that he may have to answer the Court's questions both about the rights he is giving up and about the facts of his case. Any statements the Defendant makes during such a hearing would not be admissible against him during a trial except in a criminal proceeding for perjury or false statement.

      h. If the Court accepts the Defendant's plea of guilty, there will be no further trial or proceeding of any kind, and the Court will find him guilty.

      i. By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status. The Defendant recognizes that if he is not a citizen of the United States, pleading guilty may have consequences with respect to his immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including his attorney or the Court, can predict with certainty the effect of a conviction on immigration status. Defendant nevertheless affirms that he wants to plead guilty regardless of any potential immigration consequences.

### Advisory Sentencing Guidelines Apply

5. The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551-3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

### Factual and Advisory Guidelines Stipulation

6. This Office and the Defendant understand, agree and stipulate to the Statement of Facts set forth in Attachment A hereto which this Office would prove beyond a reasonable doubt, and to the following applicable sentencing guidelines factors:

Base Offense Level: The parties agree that a base offense level of fourteen (14) is applicable to the count of conviction. U.S.S.G. § 2J1.2 **(SUBTOTAL = 14)**

Acceptance of Responsibility: This Office does not oppose a two-level reduction in the Defendant's adjusted offense level, based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the Defendant's offense level prior to consideration of acceptance of responsibility is level 16 or greater, this Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional one-level decrease in recognition of the Defendant's timely notification of his intention to plead guilty. This Office may oppose *any* adjustment for acceptance of responsibility if the Defendant (a) fails to admit each and every item in the factual stipulation; (b) denies involvement in the offenses; (c) gives conflicting statements about his involvement in the offenses; (d) is untruthful with the Court, this Office, or the United States Probation Office; (e) obstructs or attempts to obstruct justice prior to sentencing; (f) engages in any criminal conduct between the date of this agreement and the date of sentencing; or (g) attempts to withdraw his plea of guilty.

**Total**: The adjusted guideline level after adjustment for acceptance of responsibility is **12**.

7. The Defendant understands that there is no agreement as to his criminal history or criminal history category, and that his criminal history could alter his offense level if he is a career offender or if the instant offense was a part of a pattern of criminal conduct from which he derived a substantial portion of his income.

8. This Office and the Defendant agree that with respect to the calculation of the advisory guidelines range, no other offense characteristics, sentencing guidelines factors, potential

4

departures or adjustments set forth in the United States Sentencing Guidelines will be raised or are in dispute.

### Obligations of the United States Attorney's Office

9. At the time of sentencing, this Office will recommend a sentence within the advisory guidelines range determined by the Court at sentencing, restitution in the amount of $148, 297, forfeiture, no fine, and $100 special assessment.

10. The parties reserve the right to bring to the Court's attention at the time of sentencing, and the Court will be entitled to consider, all relevant information concerning the Defendant's background, character and conduct.

### Restitution

11. The Defendant agrees to the entry of a Restitution Order in the amount of $148,297. The Defendant agrees to pay $100,000 within two days of sentencing, and the Defendant agrees that the $48,297 he has voluntarily provided the government will be applied towards his restitution payment. The Defendant agrees that, pursuant to 18 U.S.C. § 3664, the Court may order the $148,297 as the Defendant's full restitution in this case.

### Waiver of Appeal

12. In exchange for the concessions made by this Office and the Defendant in this plea agreement, this Office and the Defendant waive their rights to appeal as follows:

   a) The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or otherwise, to appeal the Defendant's conviction;

   b) The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal the judgment and whatever sentence is imposed, including any fine, term of supervised release, order of restitution, or order or forfeiture and any issues that relate to the establishment of the advisory guidelines range, except as follows: the Defendant reserves the right to appeal from any sentence that is above the final adjusted advisory guidelines range, and this Office reserves the right to appeal from any sentence that is below the final adjusted advisory guidelines range.

   c) Nothing in this agreement shall be construed to prevent the Defendant or this Office from invoking the provisions of Federal Rule of Criminal Procedure 35(a), or from appealing from any decision thereunder, should a sentence be imposed that resulted from arithmetical, technical, or other clear error.

d) The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

### Obstruction or Other Violations of Law

13. The Defendant agrees that he will not commit any offense in violation of federal, state or local law between the date of this agreement and his sentencing in this case. In the event that the Defendant (i) engages in conduct after the date of this agreement which would justify a finding of obstruction of justice under U.S.S.G. § 3C1.1, or (ii) fails to accept personal responsibility for his conduct by failing to acknowledge his guilt to the probation officer who prepares the Presentence Report, or (iii) commits any offense in violation of federal, state or local law, then this Office will be relieved of its obligations to the Defendant as reflected in this agreement. Specifically, this Office will be free to argue sentencing guidelines factors other than those stipulated in this agreement, and it will also be free to make sentencing recommendations other than those set out in this agreement. As with any alleged breach of this agreement, this Office will bear the burden of convincing the Court of the Defendant's obstructive or unlawful behavior and/or failure to acknowledge personal responsibility by a preponderance of the evidence. The Defendant acknowledges that he may not withdraw his guilty plea because this Office is relieved of its obligations under the agreement pursuant to this paragraph.

### Court Not a Party

14. The Defendant expressly understands that the Court is not a party to this agreement. In the federal system, the sentence to be imposed is within the sole discretion of the Court. In particular, the Defendant understands that neither the United States Probation Office nor the Court is bound by the stipulation set forth above, and that the Court will, with the aid of the Presentence Report, determine the facts relevant to sentencing. The Defendant understands that the Court cannot rely exclusively upon the stipulation in ascertaining the factors relevant to the determination of sentence. Rather, in determining the factual basis for the sentence, the Court will consider the stipulation, together with the results of the presentence investigation, and any other relevant information. The Defendant understands that the Court is under no obligation to accept this Office's recommendations, and the Court has the power to impose a sentence up to and including the statutory maximum stated above. The Defendant understands that if the Court ascertains factors different from those contained in the stipulation set forth above, or if the Court should impose any sentence up to the maximum established by statute, the Defendant cannot, for that reason alone, withdraw his guilty plea, and will remain bound to fulfill all of his obligations under this agreement. The Defendant understands that neither the prosecutor, his counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

6

## Entire Agreement

15.  This letter supersedes any prior understandings, promises, or conditions between this Office and the Defendant and, together with the Sealed Supplement, constitutes the complete plea agreement in this case. The Defendant acknowledges that there are no other agreements, promises, undertakings or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement and none will be entered into unless in writing and signed by all parties.

If the Defendant fully accepts each and every term and condition of this agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Rod J. Rosenstein
United States Attorney

By: _____
Gregory R. Bockin
Assistant United States Attorney

I have read this agreement, or have had this agreement read to me, including the Sealed Supplement, and carefully reviewed every part of it with my attorney Larry A. Nathans. I understand it, and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney, and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

9/11/13
Date

George Warhola
GEORGE WARHOLA

I am Larry A. Nathans, attorney for George Warhola. I have carefully reviewed every part of this agreement, including the Sealed Supplement, with him. He advises me that he understands and accepts its terms. To my knowledge, his decision to enter into this agreement is an informed and voluntary one.

9/11/13
Date

Larry A. Nathans, Esq.
Attorney for George Warhola

8

## Attachment A
### Statement of Facts

*If the case had proceeded to trial, the Government would have proven the following facts beyond a reasonable doubt. This statement of facts does not constitute all of the facts provable by the Government.*

**GREGG LEE PURBAUGH** and **KENNETH TRAINUM** opened a warehouse business known as Bear Creek Warehouse Co.("Bear Creek"), which was located at 7657 Canton Center Drive, Baltimore, Maryland 21224. Bear Creek's primary customer was a company known as GI. GI is an international mining company. GI mines nickel abroad and then sells it in the United States. The mined, pure nickel is in the form of a briquette, and is shipped via cargo containers from GI's mines outside the United States. Nickel briquettes are typically packed in large nylon sacks called super sacks. Super sacks typically contain two (2) metric tons of nickel each. Nickel briquettes are a raw form of the elemental metal used in the production of stainless steel and other alloys. **PURBAUGH** and **TRAINUM** provided warehouse services for GI's nickel shipments that came in to the Port of Baltimore via ship.

C.M. operates Three Rivers Scrap Metal, Inc. ("Three Rivers"), which is located at 825 Behan Street, Pittsburgh, PA. C.M., through Three Rivers, buys and sells a variety of metal products in the Pittsburgh area.

**GEORGE WARHOLA** operated a scrap metal business called "A.J. Warhola Scrap Metal" which was located at 875 Progress Street, Pittsburgh, Pennsylvania 15212.

C.M. and others including but not limited to **GEORGE WARHOLA** engaged in a conspiracy to knowingly and willfully evade reports relating to coins and currency received in a non-financial trade or business. **GEORGE WARHOLA** acted as a middleman in the transport, storage, and sale of some of the stolen nickel from GI at the Bear Creek warehouse in Baltimore, Maryland and Three Rivers in Pittsburgh, Pennsylvania.

**PURBAUGH** began to remove nickel from legitimate GI shipments, and set that stolen nickel aside so that he could sell it later in the black market. **PURBAUGH**, who resides in Maryland, contacted **GEORGE WARHOLA**, who resides near Pittsburgh, PA, regarding the sale of nickel he had stolen from GI. **PURBAUGH** asked **GEORGE WARHOLA** if he was interested in purchasing nickel for resale in the Pittsburgh area. **GEORGE WARHOLA** needed to find a buyer in Pittsburgh, because he did not have the contacts or the ability to sell pure nickel on his own. **GEORGE WARHOLA** approached C.M. with a plan to sell the stolen nickel to Three Rivers. Once that deal was complete, **GEORGE WARHOLA** agreed with **PURBAUGH** to purchase the nickel which had been stolen from GI, and subsequently sell it to C.M. **GEORGE WARHOLA** never received any documentation related to the nickel's purchase, origin, or transport, from **PURBAUGH**. Any commercial sales transaction involving legitimate Nickel would have included the issuance of Purchase Orders, Invoices, Country of Origin Certificates, Bills of Lading, Bills of Sale and weight receipts, among other documentation.

the issuance of Purchase Orders, Invoices, Country of Origin Certificates, Bills of Lading, Bills of Sale and weight receipts, among other documentation.

Throughout the course of the conspiracy, C.M. would locate a buyer for the nickel, then he and **GEORGE WARHOLA** would work out the details of the transaction. **GEORGE WARHOLA** wanted to be paid in cash before he received the nickel. C.M. agreed to pay **GEORGE WARHOLA** cash up front. To disguise the cash transactions, C.M. created false Nickel Receipts which indicated phony names for the nickel seller, and also created false entries in Three River's books, so that the nickel's seller could not be traced. During a twelve-month period beginning in April 2010, and continuing to approximately November, 2010, C.M. paid **GEORGE WARHOLA** more than $10,000 in cash on multiple occasions, but in order to conceal these transactions C.M. created at least twenty-four (24) false nickel receipts to evade the reporting requirements relating to coins and currency received in a non-financial trade or business.

On June 27, 2011, Special Agents from the Department of Homeland Security arrived at George Warhola Scrap Metal, 875 Progress Street, Pittsburgh, Pennsylvania 15212. One of the Special Agents explained that a Grand Jury Subpoena had been sent to George Warhola Scrap Metal at 875 Progress Street, Pittsburgh, Pennsylvania 15212 via certified mail. The subpoena sought "Copies of all records of the purchase, warehousing and sale of nickel material for the time period of January 1, 2009 to present." The Special Agents then began questioning **GEORGE WARHOLA** about the subject matter of the subpoena. Specifically, they asked **GEORGE WARHOLA** how often he purchased and sold nickel material. **GEORGE WARHOLA,** knowing that a Grand Jury investigation had commenced, stated that he did not normally deal in nickel, and that he had not had a load of nickel in his scrap metal shop recently. Later in the interview, **GEORGE WARHOLA** reiterated that he did not deal in nickel. These statements were not true, and impeded the Grand Jury's investigation.

**GEORGE WARHOLA** knew that the nickel from **PURBAUGH** and **TRAINUM** was stolen, and he bought and sold nickel that he knew to be stolen. In addition, **GEORGE WARHOLA** recently had a load of this stolen nickel in his scrap metal shop. These statements were not true, and **GEORGE WARHOLA** knew that they were not true. **GEORGE WARHOLA** acted corruptly with the specific intent to obstruct or impede the Grand Jury proceeding in its due administration of justice by providing false information to Special Agents assisting with the ongoing grand jury investigation and who could potentially report that information to the Grand Jury.

As the result of **GEORGE WARHOLA**'s conduct, **WARHOLA** agrees that he owes $148,297 in restitution to GI, the victim in this case.

9/11/13
Date

*George A. Warhola*
GEORGE WARHOLA

I am Mr. Warhola's attorney. I have carefully reviewed the statement of facts with him.

9/11/13
Date

LARRY A. NATHANS, ESQ.

11